AO 106A  (08/18)  Application for a Warrant by Telephone or Other Electronic Means

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

United States Courts
Southern District of Texas
**FILED**

*January 14, 2022*

Nathan Ochsner, Clerk of Court

# UNITED STATES DISTRICT COURT
### for the
Southern District of Texas

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

████████████████████████

)
)
)
)
)

Case No.

**4:22-mj-107**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

████████████████████████████████

located in the _____Southern_____ District of _____Texas_____ , there is now concealed *(identify the person or describe the property to be seized)*:

████████████████████████████████████

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

TRUE COPY I CERTIFY
ATTEST: 1/15/22
NATHAN OCHSNER, Clerk of Court
By:   *s/George Kelner*
Deputy Clerk

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| ███████████ | ████████████████ |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attach████████████████

*Applicant's  signature*

████████ Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephonic communication_____ *(specify reliable electronic means).*

Date:   __January 14, 2022__

*Judge's signature*

City and state:   Houston, Texas

Andrew M. Edison, United States Magistrate Judge

*Printed name and title*

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

**IN THE MATTER OF THE SEARCH OF**

███████████████████████

**CASE NO.** 4:22-mj-107

**UNDER SEAL**

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION UNDER RULE 41 FOR A
### WARRANT TO SEARCH AND SEIZE

I, ███████████, Special Agent of the Federal Bureau of Investigation, being duly sworn, depose and state that:

### INTRODUCTION

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as ████████████ ██████████████████████████████████████████ for the things described in Attachment B.

2.      ██████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

1

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

3.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ ) (hereinafter, the "Target Offenses") have been

---

[1] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████

[2] FARA requires certain individuals who are engaged in specified activities on behalf of foreign principals—including political and public relations activity—to register with the Attorney General and provide disclosures about their activity so that the U.S. government and the people of the United States are informed of the source of information and the identity of persons attempting to influence U.S. public opinion, policy, and law. FARA imposes criminal penalties on any person who willfully violates any provision of the Act. Section 219, Title 18, United States Code,

committed by: Henry Cuellar, Imelda Cuellar, Mina "Colin" Strother, Irada Akhoundova, ██████ ███████████████████████████, Florencio "Lencho" Rendon, and others known and unknown. There is also probable cause to search the PREMISES described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

## PROBABLE CAUSE

### Introduction

4.      ████████████████████████, the Federal Bureau of Investigation ("FBI"), in partnership with the Department of State Office of the Inspector General ("DOS-OIG"), has been investigating allegations of bribery, corrupt foreign influence, and related criminal activity involving Henry Cuellar (Cuellar), the sitting United States Congressman representing Texas's 28th Congressional District (Laredo and San Antonio and surrounding areas), as well as individuals representing the Government of Azerbaijan; individuals and companies domiciled in Mexico; ███████████████████████████████████████████████████████

████████████████████████

5.      Since at least 2014, Cuellar has accepted large, repeated payments through apparent shell companies established by his wife, Imelda Cuellar, who conducts no apparent legitimate business in exchange for the payments.  The funds funneled to Cuellar, through his wife's businesses, stem from two principal sources: (1) foreign principals[3] in Azerbaijan, including the Government of Azerbaijan, or the agents of such foreign principals in the United States ("AZ

---

prohibits public officials, including Members of Congress, from engaging in registerable activity under FARA.

[3] Under FARA, the term "foreign principal" includes a foreign government or political party, a person outside the Untied States who is not a citizen of and domiciled within the United States, and a partnership, corporation, or other business entity organized under the laws of or having its principal place of business in a foreign country.  22 U.S.C. § 611(b).

Schemes"); and (2) foreign principals in Mexico, or the agents of such foreign principals in the United States ("MX Scheme"). In total, from 2014 to 2019, as described in more detail below, Cuellar and Imelda Cuellar appear to have accepted more than $575,000 originating in Azerbaijan and Mexico. ████████████████████████████████████████████████

████████████████████████████████████████

6.      Based on the investigation to date, as described in detail below, there is probable cause to believe that Cuellar accepted these payments originating in Azerbaijan and Mexico, through Imelda Cuellar's shell companies, in return for being influenced in the performance of official acts in his capacity as a Member of Congress, ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

### The AZ Schemes

*Relevant Individuals and Entities*

7.      The Republic of Azerbaijan ("Azerbaijan") is a former Soviet republic that gained independence in 1991. ████████████████████████████████████ is a wholly state-owned national oil and gas company headquartered in Baku, Azerbaijan.

8.      ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████

9.      Irada Akhoundova ("Akhoundova") is a naturalized United States citizen from Azerbaijan.  Akhoundova was or is the president, owner, or manager of several companies relevant to the investigation, including ██████████████████████████ the U.S. subsidiary of ████████████████████████████ a business headquartered in Baku, Azerbaijan, that purports to provide financial and consulting services and operates branch offices in various international locations.  ████████ is registered in Delaware, Texas, and the District of Columbia, and Akhoundova was its president from approximately 2014 to 2017. ██████████████████ ████████████████████████████

10.     ██████████████████████████████ was Azerbaijan's Ambassador to the United States from approximately October 2011 until July 2021. ████████████ previously served as Consul General to Azerbaijan's consulate in Los Angeles beginning in or about November 2005.

11.     ██████████████████████████ is a citizen of Azerbaijan and a ████████████ ████████████████████ ██████████████████████████████████ ██████████████████████████████████ Between approximately 2006 and 2010, ██████████ served as Vice Consul at Azerbaijan's consulate in Los Angeles, serving directly under ██████████████████ is now the owner, president, and/or director of several companies ██████████████████████████████ ████████████████████████████

12.     Mina "Colin" Strother ("Strother") is a U.S. citizen who works as a political campaign consultant ████████████████████. Previously, Strother served as Chief of Staff to Cuellar.   During the relevant period of investigation, Strother operated a consulting company known as ████████████. Cuellar has retained Strother for work on Cuellar's reelection campaigns and as a political consultant and media spokesperson. ████████████









28.     Within two weeks, on or about September 23, 2014, Imelda Cuellar filed with the state of Texas for the conversion of ████—which had been an incorporated company since 2012 but appears to have been inactive—to a Limited Liability Corporation. ████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

      ██      ████████████████████████████████████

████████████████████████████████████████

      ██      ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

      ██      ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[5] ████████████████████████████████████



35.  ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

36.  On November 29, 2014, Imelda Cuellar sent another email to ██████████, again

copying ████████ this time including an invoice for the services allegedly performed by ██████ on

behalf of ██████ ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

37.  On December 1, 2014, the ██████ account received a $60,000 internal bank transfer

from a ██████ account owned by ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

██ ████████████████████████████████████████████████

████████████████████████████████████





39.

██████████████████████████████████████   █████████████

██████████████████████████████████

██   ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████

43.     For the six-month period following the initial $60,000 payment from ████████

there is no evidence that Imelda Cuellar provided any legitimate services through ██████ ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

██   ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████

*The Cuellars Accept Additional Azerbaijani Funds Through*
*Second Contract on which Imelda Cuellar Did Not Perform*

45.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

██   █████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

████████████████████████

██████████████████████████████

████████████████████

██████████████████████



49.     On June 25, 2015, ███████ account received another $60,000 deposit, this time in the form of an international wire transfer directly from ████████████████████ in Baku,

Azerbaijan. ██████████████████████████████████████████

████████████████

██        ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████

██        ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

*Cuellars Pause Their Acceptance of Azerbaijani Funds During Period of Increased Scrutiny*

52.     After the June 2015 payment to ██████, payments from Azerbaijan to Imelda Cuellar and Cuellar stopped—just as various investigations into, and media coverage of, Azerbaijan's secret lobbying activities and ██████ role in those activities was launched.

53.     In May 2015, multiple major media outlets issued reports regarding an Office of Congressional Ethics ("OCE") investigation ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

54. 

*Cuellars Resume Scheme to Accept Azerbaijani Funds Through Another Shell Contract*

57.     Beginning in January 2018, Imelda Cuellar again began to accept large payments, routed through apparent shell companies, from Azerbaijan.  In the months leading up to the resumption of these payments, Cuellar and ▮▮▮▮▮ exchanged repeated communications in which ▮▮▮▮▮ asked Cuellar for various actions, including as described below.

58.     On March 31, 2017, Cuellar messaged ▮▮▮▮▮ stating: "Submitted language today." In response, ▮▮▮▮▮ stated: "You are the best El Jefe!"  Cuellar responded: "Yes sir."

59.





65.     On September 1, 2017, ▮▮▮▮▮ messaged Cuellar stating: ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ regarding funding for demining projects in Azerbaijan.  Cuellar responded

approximately 20 minutes later, "I see it. We work on it." ▮▮▮▮▮ replied, "Thank you Boss!"

66.     Five days later, on September 6, 2017, ▮▮▮▮▮ again messaged Cuellar about

the legislation.  ▮▮▮▮▮ asked Cuellar whether he knew Congressperson 1 and whether there

was "[a]ny chance of talking him into withdrawing his amendment or no way?" ▮▮▮▮▮ noted

that the legislation was "[c]oming up on the floor today."  Cuellar responded, "I will ask him."

67.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮

---

[7] Based on information I have gained in the course of this investigation, I am aware that Azerbaijan and Armenia share a border and have historically competed for support from the United States.

68.     On September 27, 2017, ███████████ messaged Cuellar again about his daughter's passport matter. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███   ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████

███   ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████

71.     Over the next few days, ███████████ and Cuellar exchanged messages about Cuellar meeting in San Antonio, Texas, with ███████████ "folks" and "friends," and based on the messages, a lunch meeting appears to have occurred on Friday, October 6, 2017, at a ████ ███████████ in San Antonio.

72.     Various records establish that Azerbaijan was responsible for the creation of a new company—███████████—that, as demonstrated later in this Affidavit, was ultimately the vehicle for resumed, concealed payments from Azerbaijan to Cuellar.  Records filed with the State of Texas on August 22, 2017, show that ████████████████████████████████ ████████████████████████—served as the registered agent and sole manager for a new Texas corporation called ████████████████████   ████████████████████ ████████████████████████████████████

73. ████████████████████████████████ was wholly owned by an Azerbaijan-based company, ██████████████████████, ████████████████████ ████████████████████████████████████████████████████████ ██████████████████████

74. ████████████████████████████████████████ is a foreign construction and engineering firm based in Baku, Azerbaijan. ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████

██ ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████

76. On September 26, 2017, ████████████████████████████████ ████████████████████████████████████████████, the ████████████ account received a $250,000 wire transfer from Azerbaijan. ████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████

██ ████████████████████████████████████████ ████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████

78.     On November 6, 2017, Imelda Cuellar e-mailed Henry Cuellar a document, titled:

"Articles of Organization for ██████████████████ docx" with the request: "Please review.

Thanks." The attached document was a one-page article of organization for a new company called

██████████████████████████████████████████████████

███████████████████████████████████████   ██████████████   ███████

████████████████████████

79.     ██████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████

███   ██████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

████████

81.    On January 24, 2018, Imelda Cuellar opened checking and savings accounts with

████████████████ on behalf of █████████████. █████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

82.    ████████████████████████████████████████████████████

████████ on January 29, 2018, █████████████ made a series of large check deposits, detailed in the

below table, from █████████████ account into █████████████████ account, totaling $210,000

traceable to the original transfer of $250,000 from Azerbaijan to █████████████:

| TABLE 2 | | | |
|---|---|---|---|
| 2017-2019 Payments from ████████ to ████████████ | | | |
| Date | Check # | Amount | Check or Wire Memo Line |
| 1/29/2018 | 1002 | $20,000 | █████████ / "Consulting Services" |
| 3/8/2018 | 1003 | $40,000 | █████████ / "Consulting Services" |
| 5/15/2018 | 1004 | $40,000 | █████████ / "Consulting Services" |
| 7/18/2018 | 1006 | $40,000 | █████████ / "Consulting Services" |
| 9/27/2018 | 1007 | $40,000 | █████████ / "August - September 2018" |
| 3/19/2019 | 1027 | $30,000 | █████████ / "1/2 October, November, December" |

83.    On January 9, 2019, an additional check for $30,000, bearing the memo line "2018

Outstanding balance," was █████████████████████████████████████████

██████████████████████████—and ████████ deposited into █████████████████ account.

<hr />

[8] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████

This additional $30,000 payment from ████████████ brought the total payments from ██████████ to ████████████ to $240,000.

84.   ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

███   ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

███   ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

███   ████████████████████████████████

███████████████   ████████████   ██████████

████████████████████████████████████████

████████████████████████████████████████

████████

88. 



*Cuellar's Contacts with Azerbaijani Foreign Principals*

89.     In January 2013, ████ privately sponsored and funded a trip, through ████, for Cuellar and Imelda Cuellar to Istanbul, Turkey and Baku, Azerbaijan, during the approximate time period of January 5 to January 13, 2013. █████████████████████████████

92.     In sum, during the January 2013 trip, Cuellar and Imelda Cuellar travelled to Azerbaijan together, were introduced to representatives of the same entities that later routed veiled payments to the Cuellars, and the trip was funded by ████, who appears to have been part of the scheme to route Azerbaijani funds to the Cuellars and is known to have been acting on behalf of Azerbaijani interests at the time.

93.





96. ▮▮▮▮▮▮▮▮ received its first payment of $20,000 from Azerbaijan through ▮▮▮▮▮▮ on or about January 30, 2018, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and a second payment of $40,000 from ▮▮▮▮▮▮ on March 9, 2018, ▮▮▮▮▮▮▮ ▮▮▮▮▮▮. On May 15, 2018, ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ received a third payment of $40,000 from ▮▮▮▮▮▮.

97. ▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████████████

████

*Cuellar's Acts Beneficial to Azerbaijan*

98.    During the relevant time under investigation, including periods of time in which Imelda Cuellar's companies were receiving funds from foreign principals tied to Azerbaijan, Cuellar took extensive action that promoted the political interests of Azerbaijan, including, but not limited to: ██████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ ████████████████.

                          ████████████████

███  ████████████████████████████████████

███████████████████████████████████████████████████████

████████████████

*Relevant Individuals and Entities*

100.    Florencio "Lencho" Rendon ("Rendon") is a businessman and former Chief of Staff to a now-retired Member of Congress.  He is the current President of both ███████████████ ████████ and ████████████████., which are related, financially interconnected consulting firms based in the Corpus Christi, Texas area.  ████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████





103.    In addition, as described in detail below, the investigation has discovered a series of financial transactions originating in Mexico, passing through Rendon's ███████, and ultimately funneled into the account of one of Imelda Cuellar's shell companies.

*Cuellars Accept Large Payments Funneled from Mexico, Through Rendon*

104.    As part of the ██████████, the investigation has identified a pattern of financial transactions between 2016 and 2018, which originated with foreign principal accounts at ████ ██████ based in Mexico; moved through international banks in Spain; were then funneled through various U.S. bank accounts of the Cuellars' associates; and then were deposited into one of Imelda Cuellar's shell companies, ██████. This pattern, as traced backward from the ██████ account, is described in detail below.

105.    Between 2016 and 2018, Imelda Cuellar's ███████ account received approximately $215,000—in 18 separate checks and wire transfers, ranging from approximately $10,000 to $20,000—from Strother's business account ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ The 18 payments are detailed in the table below:

| TABLE 3 | | | | |
|---|---|---|---|---|
| 2016-2018 Payments from ████████████ to ██████ | | | | |
| Date | Method | Check # | Amount | Check or Wire Memo Line |
| 3/29/2016 | Cashier's Check | 354726 | $10,000 | "January Payment" |
| 3/29/2016 | Cashier's Check | 354728 | $10,000 | "Fedruary Payment" |
| 4/22/2016 | Wire Transfer | N/A | $9,990 | --- |
| 6/8/2016 | Wire Transfer | N/A | $19,990 | "April-May Invoice" |
| 7/20/2016 | Wire Transfer | N/A | $10,000 | "June Invoice" |
| 9/1/2016 | Wire Transfer | N/A | $10,000 | --- |
| 9/26/2016 | Wire Transfer | N/A | $10,000 | --- |
| 11/1/2016 | Wire Transfer | N/A | $10,000 | "Sept. Payment" |
| 12/27/2016 | Wire Transfer | N/A | $19,970 | --- |
| 3/7/2017 | Wire Transfer | N/A | $9,990 | "January Payment" |
| 4/4/2017 | Wire Transfer | N/A | $10,000 | "March Payment" |
| 5/20/2017 | Cashier's Check | 616686 | $10,000 | "April Payment" |
| 6/21/2017 | Wire Transfer | N/A | $9,950 | "April Payment" |
| 7/26/2017 | Cashier's Check | 657900 | $10,000 | "June Payment" |
| 9/1/2017 | Cashier's Check | 682472 | $10,000 | "June Payment" |
| 11/1/2017 | Cashier's Check | 719321 | $15,000 | "August and September" |
| 12/29/2017 | Cashier's Check | 755691 | $10,000 | "November" |
| 1/25/2018 | Cashier's Check | 772497 | $20,000 | "November & December Fee" |

106.    As described above, Strother is a known associate and former staffer of Cuellar.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████

107.     Preceding each of these payments from Strother ████████ to Imelda Cuellar's ████ account, financial records show there is a corresponding payment, or nearly corresponding payment, made to ████████████ from ████████ or ████████████ in the form of checks signed by Rendon.

108.     The table below reflects 21 payments, $242,000 from bank accounts in the name of Rendon's companies, ████████ and ████████████, that were made to ████████████████ before Strother funneled the payments on to ████████ Imelda Cuellar's shell company:

| TABLE 4 | | | | |
|---|---|---|---|---|
| **2016-2018 Payments to** ████████████ | | | **from Rendon-Controlled Companies** | |
| **Date** | **Method** | **Check #** | **Amount** | **Check or Wire Memo Line** |
| 3/24/2016 | Check | 1565 | $22,000 | "████████ Consulting" |
| 4/8/2016 | Check | 1567 | $11,000 | "Monthly Consulting Fee" |
| 6/3/2016 | Check | 1589 | $11,000 | "March Services" |
| 6/3/2016 | Check | 1590 | $11,000 | "April Services" |
| 7/14/2016 | Check | 1568 | $11,000 | "June ████████" |
| 8/8/2016 | Check | 1607 | $11,000 | "July Payment ████████ Project" |
| 9/14/2016 | Check | 1611 | $11,000 | "August" |
| 10/20/2016 | Check | 1622 | $11,000 | "Consulting ████████ Sept" |
| 12/8/2016 | Check | 1569 | $11,000 | "Nov" |
| 12/20/2016 | Check | 1633 | $11,000 | "Dec Invoice Consulting" |
| 2/13/2017 | Check | 1648 | $11,000 | "Jan Payment per Contract" |
| 3/20/2017 | Check | 1667 | $11,000 | "Feb Payment" |
| 4/17/2017 | Check | 1678 | $11,000 | "March" |
| 5/29/2017 | Check | 1681 | $11,000 | "Apr. Payment" |
| 6/28/2017 | Check | 1695 | $11,000 | "May" |

| 8/7/2017 | Check | 1706 | $11,000 | "June" |
|---|---|---|---|---|
| 9/7/2017 | Check | 1718 | $11,000 | "July 2017" |
| 9/22/2017 | Check | 1721 | $11,000 | "Aug" |
| 10/16/2017 | Check | 1728 | $11,000 | "Sept" |
| 12/15/2017 | Check | 1221 | $11,000 | "Nov" |
| 12/27/2017 | Check | 1750 | $11,000 | "Dec" |

109. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

110.    A review of financial records indicates that the funds funneled from Rendon to Strother (through ▮▮▮▮▮▮▮▮▮▮), and then ultimately to Imelda Cuellar, originated from ▮▮▮▮▮▮▮ in Mexico, where they were routed through international banks in Spain before ultimately being sent to an intermediary company, ▮▮▮▮▮▮▮▮▮▮▮▮, before being sent to Rendon's companies.  Records obtained during this investigation show that ▮▮▮▮▮▮▮▮ is a California and Delaware corporation affiliated through common ownership in Mexico with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮

111.    As detailed in the table below, wire transfer records for ▮▮▮▮▮▮▮▮▮ ▮▮▮▮ account show that between February 2016 and January 2019, ▮▮▮▮▮▮▮▮ made 31 wire transfers and one check payment to ▮▮▮▮▮ for a total of $540,000 from a ▮▮▮▮▮ ▮▮▮▮▮▮ account.

| TABLE 5 | | | |
|---|---|---|---|
| 2016-2019 Payments from ███████████ to ███████ | | | |
| Date | Method | Amount | Check or Wire Memo Line |
| 2/22/2016 | Wire | $30,000 | "████████████████ INVOICES 1164, 1165" |
| 3/15/2016 | Wire | $15,000 | "██████████████ MARCH INVOICE-1166" |
| 4/7/2016 | Check | $15,000 | "INV#1168" |
| 4/26/2016 | Wire | $15,000 | "██████████ INVOICES 1168" |
| 6/17/2016 | Wire | $15,000 | "██████████ INVOICES 1170" |
| 7/15/2016 | Wire | $15,000 | "█████████ INVOICE 1172" |
| 9/6/2016 | Wire | $15,000 | "█████████ INVOICE 1173" |
| 9/22/2016 | Wire | $15,000 | "████████████ SEPT INVOICE 1174" |
| 11/1/2016 | Wire | $30,000 | "███████████ INVOICE 1175, 1176" |
| 12/8/2016 | Wire | $15,000 | "███████████ DEC INVOICE 1181" |
| 2/1/2017 | Wire | $15,000 | "██████████ JAN INVOICE 1184" |
| 2/22/2017 | Wire | $15,000 | "██████████ FEB INVOICE 1185" |
| 3/21/2017 | Wire | $15,000 | "████████ INVOICE 1186" |
| 4/13/2017 | Wire | $15,000 | "██████████ APRIL INVOICE 1190" |
| 5/24/2017 | Wire | $15,000 | "█████████ INVOICE 1191" |
| 6/7/2017 | Wire | $15,000 | "███████████ JUNE INVOICE 1192" |
| 7/27/2017 | Wire | $15,000 | "███████████ INVOICE 1195" & "JULY CONSULTING FEES" |
| 9/12/2017 | Wire | $30,000 | "AUG, SEPT INVOICES INV 1196-1197" |
| 10/19/2017 | Wire | $15,000 | "█████████ INVOICE 1204" |
| 11/7/2017 | Wire | $15,000 | "█████████ INVOICE 1205" |
| 12/15/2017 | Wire | $15,000 | "██████████ DEC INVOICE 1206" |
| 2/21/2018 | Wire | $30,000 | "█████████ INVOICES 1207,1208" |
| 3/16/2018 | Wire | $15,000 | "█████████ INVOICE 1209" |
| 3/22/2018 | Wire | $15,000 | "█████████ INVOICE 1209" |
| 5/22/2018 | Wire | $15,000 | "INVOICE 1211" |
| 6/4/2018 | Wire | $15,000 | "INVOICE 1212" |
| 7/13/2018 | Wire | $15,000 | "JULY INVOICE 1213" |
| 8/10/2018 | Wire | $15,000 | "████████████ INVOICE 1214" |
| 9/10/2018 | Wire | $15,000 | "████████████ INVOICE 1215" |
| 10/16/2018 | Wire | $15,000 | "████████████ INVOICE 1216" |
| 11/23/2018 | Wire | $15,000 | "████████████ INVOICE 1217" |
| 1/9/2019 | Wire | $15,000 | "████████████ INVOICE 1218" |

112.    As reflected in the above table, the transfers from ████████████ to ████████ began on February 22, 2016, immediately prior to the start of Rendon's payments to Strother █ ████████   The payments, nearly all by interstate wire, continued approximately monthly or bi-monthly in amounts of either $15,000 or $30,000 until January 2019.   The $30,000 payments typically occurred when there had been no $15,000 transfer the previous month, indicating that the $30,000 transfer was made in lieu of two $15,000 transfers.

113.    ████████████████████████, records reviewed to date indicate that the entirety of funds used by ████████████ to pay ████████ ($540,000) flowed ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████   Open-source information regarding ████████ suggests that ████████ is engaged in the business of currency exchange, primarily in Europe, with the ability to convert Mexican currency to U.S. dollars.

114.    ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ ██ ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

38

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

*The Cuellars' Contacts with Foreign Principals Based in Mexico*

116.   ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

117.   ███████████  is based in Mexico City and has a significant market presence in lower-income sectors with customers seeking microlending, microfinance, and consumer financing services.  ████████████████████████████████

████████████████████████████████████████████

██████  holdings also include U.S.-based company ██████████████████████

████████  a payday lending microfinance company ██████████████████████

████████

118.   ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

██   ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

██   ████████████████████████████████████████████

██████████████████████████████████████████

121.    A search of Imelda Cuellar's email accounts indicated that on January 23, 2015, Imelda Cuellar received an email from ████████████████████ believed to be the corporate email account of ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

122.    The attachment to this email from ██████, employed by ████████████ in Mexico, was a draft version of a consulting contract between ██████ and ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████    The contract proposed a consulting agreement between ██████████ to assist ████████████████████████████ in developing correspondent banking relationships with banks in the United States. ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

123.    On April 19 to 20, 2015, Cuellar engaged in a series of messages with ██████ by

WhatsApp related to the contract, as follows in pertinent part:

CUELLAR: Did you get my email on C banking?

████████ Yes. I will send you our suggestions later this evening. Abrazo

███████████████████████████████

████████████

████████████████████████████████████████

CUELLAR: Got your input. I have reviewed it and it's good, I am submitting to the committee tomorrow. I will keep you posted.

██████ Muchas gracias. Fuerte abrazo

124.    ██████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

125.    Cuellar and ██████ engaged in a similar WhatsApp conversation between June 9 to

17, 2015, as follows in pertinent part:

CUELLAR: Did u get my email?

█████████████████████████ I did you're your mail message. That is a very valuable proposal. What is the procedure it must follow? Un abrazo.

CUELLAR: I am trying to add language in two different bills. As soon as I am successful I will advise you. It's looking good.

███████ Thank you so much. I will get together with ██████ [11] next week. All the best.

CUELLAR: Language added in committee

███████: Great news, Please let me know if we can be of further help. Our dialogue with Mex and US regulators still moving forward.

126.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

███   ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

███   ████████████████████████████████████████

Between October 14 and 16, Cuellar and ██████ then engaged in the following conversation over WhatsApp, in pertinent part:

CUELLAR: At your convenience, please call Mr. Rendon about the contract. ██████████████████████

████████████████████████████████████████████

████████████████████████████████████

██████████████████████

██████████████████

████████████████████████

██████████████



█   ████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████
████████████████████████████████

████████████████████

███████████████████████████████████████████████████

███   ███████████████████████████████████████████████

██████████████████████████████████████████████████████

130.    On October 28, 2015, Imelda Cuellar emailed ██████ a draft contract between

███████ and ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███   ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

132.    Also on October 28, 2015, Cuellar communicated again with ██████ by WhatsApp

as follows in pertinent part:

CUELLAR: ██████████████████████    Imelda sent you this morning her contract for your
review. ████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████

██████████████████████████████████████████████████████████

███   ███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

43



███████████████████████████████████

███████████████████

██      ██████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████████████

██      ██████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████

*Concurrent with These Concealed Payments,* ███████████
*Interests Were at Stake in the U.S. Congress*

138.     Various issues affecting ████████████ were at stake in the U.S. Congress at the same time that the Cuellars were receiving payments through Imelda Cuellar's shell company.

139.     ████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████

140.  ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████

██   ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

142.     Related to ████████████ and payday lending, in 2016, Cuellar communicated

with █████ by way of WhatsApp.  For example, on January 23 to 25, 2016, they exchanged the

following relevant messages:

CUELLAR: Who is your person in charge of Pay loans? ███████████████

█████████████████████████████

███████████████████████████████████

CUELLAR: There is legislation that may affect you.

143.  ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████



**The Cuellars' Suspected Use of,** ▇▇▇▇▇▇▇▇▇▇▇▇▇ **Proceeds of the Schemes**

*Cuellars Spend Foreign-Based Proceeds on Personal, Rather than Business, Expenditures*

145.    To date, the Cuellars have used the proceeds traceable to Azerbaijan and Mexico-based banks to purchase consumer goods for personal use, including vehicles and clothing, and pay personal and tax debts rather than any actual business-related expenses. For example, after receiving the proceeds traceable to ▇▇▇▇ and other Azerbaijan-based entities, the Cuellars used these funds to pay for goods and services ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

██████████████████████████████████████████████████

████████████████████████████, and payments against credit card accounts and debts

associated with several of these retailers.  The FBI's financial analysis has identified that in

addition, both █████ and ████████████ have paid thousands of dollars in rent for office

space allegedly used—all within a building owned by Cuellar.

████████████████████████████████████

██    ████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██    ████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████

*Subjects Have Not Registered Pursuant to FARA*

148.    ████████████████████████████████████████

████████████████ there are no records indicating that the following individuals and entities have

ever registered under FARA or notified the Attorney General via the National Security Division

that they have been acting as an agent of a foreign government pursuant to 18 U.S.C. § 951 and 28 C.F.R. § 73.3(a)[12]:



Irada Akhoundova

149.

---

49



154. 







































d. 



**Conclusion**

196.

**THE PREMISES TO BE SEARCHED**

**DESCRIPTION OF THE PREMISES**

197.

**PROBABLE CAUSE TO SEARCH THE PREMISES**

200.











208.    As further described below and in Attachment B, and based upon a review of subscriber information, bank records, and internet provider records, I believe there is evidence that computers and other storage media used in furtherance of the criminal activity, or containing evidence of the criminal activity, described in this Affidavit, are present at the PREMISES.

**COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

209.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found.  One form in which the records are likely to be found is data stored on a computer hard drives or on other digital storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

210.    *Probable cause.*  I submit that if a computer or storage medium is found on the PREMISES, based on the facts supporting probable cause as discussed above and known, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because

when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

211.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems

can leave traces of information on the storage medium that show what tasks and processes were recently active.   Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.   Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

        b.     As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the

IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and

passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

        e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

        212.    *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

        a.      The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume

of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.      Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.      Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

213.    *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

214.    Because several people share the PREMISES, for example in the instance of a residence, as discussed above, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is

nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

### **CONCLUSION**

215.    I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,



Special Agent
Federal Bureau of Investigation

Subscribed and sworn telephonically before me on ___January 14_____, 2022, and I find probable cause.

TRUE COPY I CERTIFY
ATTEST: 1/15/22
NATHAN OCHSNER, Clerk of Court
By: ___s/ George Kelner___
                                    Deputy Clerk

Andrew M. Edison
United States Magistrate Judge

86

## ATTACHMENT A

*Property to be searched*



## ATTACHMENT B

*Property to be seized*

1. 

4. 



f. 



**Sealed**

Public and unofficial staff access
to this instrument are
prohibited by court order

United States Courts
Southern District of Texas
FILED

*January 14, 2022*

Nathan Ochsner, Clerk of Court

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

**4:22-mj-107**

In the matter of the search of　　　　§　　Case No.
　　　　　　　　　　　　　　　　　§
███████████　　　　　　　　　§　　**UNDER SEAL**

## MOTION TO SEAL SEARCH WARRANT AND AFFILIATED DOCUMENTS

COMES NOW the United States of America, by and through its attorneys, Jennifer B. Lowery, United States Attorney for the Southern District of Texas, and Assistant United States Attorney Arthur R. Jones, and moves this Court for an order sealing the affidavit of FBI Special Agent ███████, submitted in support of the application for a search warrant, the application for a search warrant, the search warrant, this motion to seal, any return of service, and any order pertaining to this motion to seal, to protect the integrity of the ongoing investigation.

RESPECTFULLY SUBMITTED this 14th day of January, 2022.

Respectfully submitted,

JENNIFER B. LOWERY
UNITED STATES ATTORNEY

TRUE COPY I CERTIFY
ATTEST: 1/15/22
NATHAN OCHSNER, Clerk of Court
By: *s/George Kelner*
　　　　　　　　　　Deputy Clerk

By: 　　/s/ Arthur R. Jones
ARTHUR R. JONES
Assistant United States Attorney
Federal Bar No. 32963
Texas Bar No. 24051986
1000 Louisiana Street, Suite 2300
Houston, Texas 77002
Phone: 713-567-9357
Fax: 713-718-3305

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

**4:22-mj-107**

In the matter of the search of       §     Case No.

███████████              §
                                §     **UNDER SEAL**

## ORDER TO SEAL SEARCH WARRANT AND AFFILIATED DOCUMENTS

The Government's Motion to Seal the Search Warrant, together with any documents, returns, or papers filed in connection with any court-authorized search as referred to in the above case caption, is hereby GRANTED.

Upon receipt of the Search Warrant pertaining to the above locations, the Clerk shall certify two copies and deliver the same to the Government agent presenting such documents for filing.

Thereafter, all papers and documents filed in connection with the Search Warrant and Application for a Search Warrant are ORDERED SEALED ~~until further Order of this Court~~. For 180 days.

SO ORDERED this ___15ᵗʰ___ day of January, 2022.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF TEXAS

TRUE COPY I CERTIFY
ATTEST: 1/15/22
NATHAN OCHSNER, Clerk of Court
By: ___s/George Kelner___
                    Deputy Clerk

AO 93  (Rev. 11/13) Search and Seizure Warrant

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

# UNITED STATES DISTRICT COURT

for the

Southern District of Texas

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No.    **4:22-mj-107** |
| ███████████████████████ | ) |
| | ) |
| | ) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Southern _____ District of _____ Texas _____
*(identify the person or describe the property to be searched and give its location)*:

█████████████████████████████████████████████████████████

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

████████████████████████████████████████████████████████████████████
██████████████████████

**YOU ARE COMMANDED** to execute this warrant on or before _____ February 1, 2022 _____ *(not to exceed 14 days)*
❐ in the daytime 6:00 a.m. to 10:00 p.m.     ❐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Andrew M. Edison or any U.S. Magistrate Judge _____ .
                                                                 *(United States Magistrate Judge)*

❐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❐ for _____ days *(not to exceed 30)*     ❐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    *1-15-22 at 9:17am*

City and state:      Houston, Texas                           Andrew M. Edison, United States Magistrate Judge
                                                                 *Printed name and title*

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>**4:22-mj-107** | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

| Print | Save As... | Reset |

AO 93  (Rev. 11/13) Search and Seizure Warrant

**Sealed**
Public and unofficial staff access
to this instrument are
prohibited by court order

# UNITED STATES DISTRICT COURT

for the

Southern District of Texas

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>████████████████████ | )<br>)<br>)   Case No.   **4:22-mj-107**<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Southern _____ District of _____ Texas _____
*(identify the person or describe the property to be searched and give its location)*:

████████████████████████████

TRUE COPY I CERTIFY
ATTEST: 1/15/22
NATHAN OCHSNER, Clerk of Court
By:    *s/George Kelner*
                              Deputy Clerk

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

████████████████████████████████████████
████████████

**YOU ARE COMMANDED** to execute this warrant on or before _____ February 1, 2022 _____ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.   ❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Andrew M. Edison or any U.S. Magistrate Judge _____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:   1-15-22 at 9:17am

City and state:     Houston, Texas

*Judge's signature*

Andrew M. Edison, United States Magistrate Judge
*Printed name and title*

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>**4:22-mj-107** | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

| Print | Save As... | Reset |

AO 93  (Rev. 11/13) Search and Seizure Warrant

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

# UNITED STATES DISTRICT COURT

for the

Southern District of Texas

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| ██████████████████████ | ) ) ) |

Case No.   **4:22-mj-107**

TRUE COPY I CERTIFY
ATTEST: 1/15/22
NATHAN OCHSNER, Clerk of Court
By:  *s/George Kelner*
Deputy Clerk

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Southern_____ District of _____Texas_____
*(identify the person or describe the property to be searched and give its location)*:

████████████████████████████████████████

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

████████████████████████████████████████████████████████████████

**YOU ARE COMMANDED** to execute this warrant on or before _____February 1, 2022_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to ___Andrew M. Edison or any U.S. Magistrate Judge___ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    *1-15-22  at  9:17am*

City and state:    ___Houston, Texas___

*Judge's signature*

Andrew M. Edison, United States Magistrate Judge
*Printed name and title*

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| | |
|---|---|
| **Return** | |

| Case No.:<br><br>**4:22-mj-107** | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| |
|---|
| **Certification** |

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

 

_____
*Executing officer's signature*

_____
*Printed name and title*

Print    Save As...    Reset

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>**4:22-mj-107** | Date and time warrant executed:<br>01/19/2022, 2:49 p.m | Copy of warrant and inventory left with:<br>Left at ▮▮▮▮▮▮, no one present @ search conclusion. |
| Inventory made in the presence of :<br>    Seizing Agent - FBI SA▮▮▮▮ - no occupant present at conclusion of search. | | |

Inventory of the property taken and name of any person(s) seized:

***SEE ATTACHED FD-597 RECEIPT FOR PROPERTY***

United States Courts
Southern District of Texas
FILED

*May 18, 2022*

Nathan Ochsner, Clerk of Court

TRUE COPY I CERTIFY
ATTEST: May 18, 2022
NATHAN OCHSNER, Clerk of Court

By: _s/ George Kelner_
                                    Deputy Clerk

| **Certification** |
|---|

        I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date:    May 14, 2022

_____                    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
                                                        *Executing officer's signature*

                                            ▮▮▮▮▮▮▮▮▮, FBI Special Agent
                                                        *Printed name and title*

**FD-597 (Rev. 4-13-2015)**

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION

# RECEIPT FOR PROPERTY



FD-597 (Rev. 4-13-2015)

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**

# RECEIPT FOR PROPERTY



FD-597 (Rev. 4-13-2015)

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
# RECEIPT FOR PROPERTY

